J-A04042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.T.J.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1770 EDA 2021 |

Appeal from the Order Entered August 4, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000157-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: D.T.J.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1771 EDA 2021 |

Appeal from the Decree Entered August 4, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000710-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D.J.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1772 EDA 2021 |

Appeal from the Order Entered August 4, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000159-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D.J.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A04042-22

:
:
APPEAL OF: PHILADELPHIA            :
DEPARTMENT OF HUMAN SERVICES       :
:
:
:
:    No. 1773 EDA 2021

Appeal from the Decree Entered August 4, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000711-2019

BEFORE:  LAZARUS, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED JULY 8, 2022**

Philadelphia Department of Human Services ("DHS") appeals from the orders denying its petitions to involuntarily terminate the parental rights of D.F. ("Father") and D.H. ("Mother") to their children, D.T.J.F. and D.D.J.F. (collectively, "the Children"). DHS has also appealed from orders denying its goal change petitions. We affirm.

D.D.J.F. and D.T.J.F. were born in January and December of 2015, respectively. DHS filed a Dependency Petition for the Children in January 2016 alleging that Mother and Father both had histories of mental illness and drug and alcohol use. The Petition further alleged that Mother was transient and lacked proper parenting skills. Trial Court Opinion, filed Sept. 30, 2021, at 2. Following a hearing in March 2016, the court adjudicated the Children dependent, but allowed them to remain in Mother's custody. *See* Order, March 16, 2016.

The following year, in August 2017, the court held a shelter care hearing and granted legal custody to DHS. *See* Order, August 11, 2017. The court

- 2 -

placed the Children with their paternal grandmother ("Grandmother"), where they have remained since that time. *See id.* In 2018, the court found aggravated circumstances related to the Children's dependency after it entered orders terminating Mother's and Father's parental rights to the Children's older siblings. *See* Order, 4/18/18; 42 Pa.C.S.A. § 6302. DHS filed a first set of petitions for Goal Change to Adoption and Involuntary Termination of Parental Rights in September 2019 but withdrew those petitions in 2020.

DHS filed the instant petitions for Goal Change to Adoption and Involuntary Termination of Parental Rights in April 2021. The court held a hearing on the petitions on August 4, 2021. D.T.J.F. was five years old at the time of the hearing, and D.D.J.F. was six. DHS presented the testimony of Tania Cody, the case manager from the community umbrella agency ("CUA"); Dr. William Russel, a forensic psychologist; and Trish Kinkle, a court-appointed special advocate ("CASA"). Mother testified on her own behalf. Father's counsel attended the hearing, but Father did not.

Cody explained that the court transferred legal custody of the Children to DHS and physical custody of the Children to Grandmother in August 2017 because Mother had absconded with them for approximately a year. N.T., 8/4/21, at 14-15. Cody testified that CUA had assigned Mother the following objectives for reunification with the Children: maintain suitable housing and employment, submit to a Parenting Capacity Evaluation ("PCE"), participate in mental health services, and participate in visitation with the Children. *Id.*

at 19-20. Cody agreed that Mother had obtained stable housing, had completed the PCE, and had demonstrated some employment history. *Id.* at 20-21, 22-25, 38, 40-42, 48, 56-58. Cody also acknowledged that Mother has a younger child in her care who has never been adjudicated dependent. *Id.* at 21, 40, 48.

Regarding visitation, Cody testified that Grandmother prevented Mother from visiting the Children at times because Grandmother "has difficulty with her communication with the case aide, who is the person who transports the [C]hildren and supervises the visits." *Id.* at 44-45. Cody has had to intervene to speak with Grandmother about her responsibility regarding the visits. *Id.* Cody relayed that the trial court has also admonished Grandmother, who is not fully cooperative. *Id.* at 47. Cody testified that more recently, visits have not taken place due to the Children's and Mother's sickness. *Id.* at 32, 44-47. She rated Mother's compliance with her visitation objective as "minimal." *Id.* at 32. Cody said that since the last court date, there have been telephone visits between Mother and Children, but no video-conferencing visits, because Grandmother does not have the capacity to facilitate them. *Id.* at 47.

Cody testified that Mother's lack of mental health treatment has been a concern throughout the life of the case and that Mother's mental health is still of concern. *Id.* at 26, 40, 47, 48. Cody stated that the PCE recommended Mother complete a psychiatric evaluation along with individual therapy, but that Mother never had the psychiatric evaluation. *Id.* at 27. Cody testified that Mother did not engage in any mental health treatment between 2016, when

she took part in mental health, drug and alcohol treatment at Chances, and 2019, when she completed an intake at Alternative Community Services. *Id.* at 26. Cody testified that Mother told her that meanwhile, in 2018, there was an incident in which Mother admitted herself to a hospital for mental health treatment, had an altercation with a security guard, attempted to assault a police officer, and threatened to kill the officer's family. *Id.* at 29.

According to Cody's testimony, Mother never followed up with Alternative Community Services following her 2019 intake but finally resumed therapy in 2020 at Dr. Mary Berge & Associates. *Id.* at 26-27. Cody testified that, because Mother had enrolled in this treatment, the court had found her to be compliant with her mental health objectives at an August 2020 hearing, and DHS thereafter withdrew the initial set of petitions. *Id.* at 40-41, 54. However, Cody learned after the 2020 hearing that Mother had attended only three of her therapy sessions and had missed four, and Mother was discharged from Dr. Mary Berge & Associates that same year. *Id.* at 26-27, 54, 56. Ultimately, Cody opined that "the mental health component of this case," which was "the very core component as to why the children . . . were remove[d] in the first place," "has not been addressed and there has not been any consistency in that matter." *Id.* at 36.

Cody testified that Father's objectives for ending his Children's dependency included completing an assessment for substance abuse and mental health diagnoses at the Clinical Evaluation Unit ("CEU"), participating in parenting classes through the Achieving Reunification Center ("ARC"),

maintaining stable housing, and participating in visitation. *Id.* at 32-33. Cody rated Father's compliance with these goals as "none." *Id.* at 33. Cody testified that she made a referral for Father to CEU, but not an appointment, because Father does not respond to her attempts to contact him. *Id.* at 51-52. She testified she last attempted to contact Father "[a] few months ago[,] . . . [r]ight before the last court date." *Id.* at 53. Cody said Father does not attend his scheduled visits with his Children, because, he claims, "he's going through a depression, he's working, he's tired, or he's unavailable." *Id.* at 52-53. Cody testified that in 2020, Father expressed an interest in taking part in parenting classes and in visiting the Children, but that he never followed through with these statements. *Id.* at 32-33.

Cody testified that the Children share a primary, parent-child bond with Grandmother, with whom they have lived since they were two years and one year old. *Id.* at 35, 39-40. Cody agreed that Grandmother provides for all of the Children's "emotional, medical, educational [and] developmental needs." *Id.* at 35. She stated it was her belief that the Children would not suffer irreparable harm from the involuntary termination of Mother's and Father's parental rights, and that termination would be in the Children's best interest. *Id.* at 36.

Dr. Russell testified as an expert in the field of clinical and forensic psychology, regarding PCEs. *Id.* at 69, 78. He testified about the assessment he made of Mother in July 2018. *Id.* at 78-79. He said that at the time he evaluated Mother, she was not capable of providing an environment for the

Children "in which to grow and develop safely." *Id.* at 81. He found Mother lacked insight into her parenting role and her responsibility in having the Children removed from her care, and he was concerned with Mother's judgment. *Id.* at 83. Dr. Russell had recommended that Mother take part in individual therapy and a psychiatric evaluation. *Id.* at 84. Dr. Russell stated he would "find it difficult" to see a change in the state of Mother's mental health without the help of counseling or therapy. *Id.* at 86-87.

Kinkle, the CASA program director, testified that CASA has been monitoring the Children since 2016. *Id.* at 91. She testified that after Mother and the Children went missing in 2016, the court issued a bench warrant, and the Children were found the following year, in August 2017. *Id.* at 90-92. Kinkle stated that Mother has been inconsistent with mental health treatment and visitation. *Id.* at 92-93. The Children expressed to Kinkle that they enjoy spending time with Mother, but also "expressed that they would like to remain with [G]randmother and that they do not want to return to [M]other." *Id.* at 93-94, 96. According to Kinkle, the Children appear bonded with Grandmother and are indifferent to ongoing visitation with Mother. *Id.* at 96. Kinkle stated that CASA recommends the Children be adopted by Grandmother, and it would be in their best interest to remain with Grandmother. *Id.* at 93, 96. She believes it would be detrimental to the Children to be removed from Grandmother's care. *Id.*

DHS also introduced a statement by the child advocate, who had spoken with the Children a few days before the hearing. *Id.* at 101. The child advocate

stated that the Children are "very, very bonded with [G]randmother. They're very happy there" and "definitely want to stay with [G]randmother as a forever home." *Id.* When the child advocate asked whether they wanted to visit with Mother, the Children responded "No, not really." *Id.*

Mother testified on her own behalf. She explained her housing and income, and testified she was working concurrently on her high school GED and an associate's degree. *Id.* at 104-11, 124-25. Mother further testified that Grandmother denied her video calls with the children. She said that while Grandmother claimed she did not have access to the FaceTime video-conferencing platform, Grandmother "told [Father] that she didn't want [Mother] to see [her] older three children." *Id.* at 120. Mother also said that she has a 20-month-old child who lives with her, who has never been removed from her care. *Id.* at 110-11; *see also id.* at 104.

Regarding her mental health concerns, Mother testified her last mental health crisis took place in October 2018, when she committed herself after learning that the termination of her parental rights as to the Children's older siblings was affirmed on appeal. *Id.* at 117-18, 122-23. Mother acknowledged that she was discharged from therapy with Dr. Mary Berge & Associates in 2020 due to her absences, but said she began going to therapy at Family Therapy Counseling in December 2020. *Id.* at 115-16. Mother did not bring any documentation of her treatment at Family Therapy Counseling to the hearing. According to Mother, her therapist at Family Therapy Counseling had called Cody twice, and Cody had never responded or tried to obtain Mother's

records. *Id.* at 116. When asked about her current attendance at Family Therapy Counseling, Mother responded,

> My last visit to therapy was in June. I know its August, but in June, I went to therapy one last time, after court, because I kind of -- I don't know, grew into a reluctance, I guess, a reluctance to deal with just continuously being -- like, I -- I haven't been in control of my life since DHS entered it 11 years ago . . . . So, I will be honest, when I stopped going in June, my therapist actually didn't even really say she need[ed] to see me. I've had three therapists diagnose me with adjustment disorder and nothing more. And the adjustment disorder was basically severing from myself and my children.

*Id.* at 114.

Mother repeated that she has not gone to therapy since June 2021, but also said, "Yes, I am in treatment." *Id.* at 115, 116, 128. When asked if she intended to "go back to therapy," Mother responded, "I am planning to go to counseling, not therapy." *Id.* at 117. She said she wants "to take a different approach" and would "rather do talk counseling, if you will." *Id.* at 126. She said that her understanding of the recommendation in the PCE was to engage in "[a] form of counseling, and if my counselor thought it necessary, which is in this recommendation as well – if a counselor made it necessary, then I would get a psychiatric eval[uation]." *Id.* at 127. She stated it was never recommended, so she never got the psychiatric evaluation. *Id.*

The court denied the petitions. *Id.* at 129.[1] DHS filed motions for reconsideration and notices of appeal. The trial court thereafter denied the motions for reconsideration. This Court consolidated the appeals.

DHS raises the following issues:

1. Did the trial court err as a matter of law and/or abuse its discretion when it denied DHS's petitions to involuntarily terminate Mother's parental rights under 23 Pa.C.S. §§ 2511(a)(5), (a)(8), and § 2511(b) where there was clear and convincing evidence that Mother failed to meaningfully address her mental health instability, a condition that necessitated Children's placement, despite evidence that Mother had been given multiple opportunities to do so over the last four years; and that termination best suited Children's needs and welfare because they did not share their primary parent-child bonds with Mother?

2. Did the trial court err as a matter of law and/or abuse its discretion when it denied DHS's petitions to involuntarily terminate Father's parental rights under 23 Pa.C.S. §§ 2511(a)(1), (a)(2), and § 2511 (b) where there was clear and convincing evidence that Father failed to perform parental duties and refused to comply with his objectives, including visitation, for four years; and that termination best suited Children's needs and welfare because they did not have a relationship with Father?

3. Did the trial court err as a matter of law and/or abuse its discretion when it denied DHS's petitions for goal change where there was clear and convincing evidence that reunification with parents was no longer viable despite the ongoing provision of reasonable efforts; and where Children deserved permanency after languishing in care for four years?

---

[1] The court issued an order for each child denying the petition to terminate Mother's and Father's parental rights to that child. The court also issued a permanency review order for each child stating that the current placement goal for the child "is return to parent or guardian." Permanency Review Order, 8/4/21, at 1.

- 10 -

DHS's Br. at 3-4 (answers below and suggested answers omitted). The Guardian *ad litem* for the Children filed a Participant's Brief, in which she sides with DHS. Mother and Father did not file briefs.

## I. Termination of Parental Rights

DHS first argues the trial court erred in denying its petition to involuntarily terminate Mother and Father's parental rights to Children. We review the trial court's decision regarding the involuntary termination of parental rights for an error of law or abuse of discretion. ***Int. of S.K.L.R.***, 256 A.3d 1108, 1129 (Pa. 2021). An abuse of discretion is present where there is a "demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." ***Id.*** at 1127 (citation omitted). We need not adopt the trial court's conclusions of law but will accept the findings of fact and credibility determinations of the trial court so long as they are supported by competent evidence of record. ***Id.*** at 1121 (citation omitted).

### A. Mother

*The Trial Court Opinion*

In its Rule 1925(a) opinion, the court explained that in denying the petition to involuntarily terminate Mother's parental rights, it relied on ***Interest of S.K.L.R.***, 256 A.3d 1108 (Pa. 2021), in which the Supreme Court reinstated the trial court order denying a similar petition. Trial Ct. Op., at 12-15. The trial court concluded that termination was not warranted here because Mother, like the mother in ***S.K.L.R.***, had sufficiently remedied the conditions leading to the children's removal aside from her mental health treatment, and

had been successful in caring for her other child for the past two years. *Id.* at 14-15.

The court also found that Mother had not wholly failed to comply with her mental health objectives, because she "has participated in at least some mental health services throughout the life of the case." *Id.* at 15. The court observed that Mother had "engaged in mental health services with the Alternative Community Resource Program, participated in therapy with Dr. Mary Berge & Associates, and is now currently receiving mental health services from Family Therapy Counseling and plans to continue." *Id.* The court did not credit Dr. Russell's testimony about Mother's mental health, as he had not evaluated Mother in three years, and acknowledged that Mother has not had a mental health episode since 2018. *Id.* The court stated it "believes that with reasonable additional time and services, Mother will be able to achieve all of her permanency plan objectives and avoid losing her parental rights." *Id.* at 16.

Regarding the bond between the Children and Mother, the court found it had been adversely affected by Mother's inability to visit with Children. *Id.* at 15. Although the Children expressed a desire to remain with Grandmother, "the [c]ourt weigh[ed] that evidence against the testimony presented that Mother has been deprived of visits with the Children due to both the COVID-19 Pandemic and [Grandmother's] interference." *Id.*

*DHS's Argument*

DHS argues the court should have terminated Mother's parental rights under subsections 2511(a)(5) and (a)(8). DHS's Br. at 31-32. DHS posits that the focus of both subsections is on the parent's failure to resolve the conditions that resulted in the placement of the child, and subsection (a)(8) does not consider a parent's willingness or ability to remedy the conditions in the future. *Id.* at 32-33. DHS argues that here, Mother's mental health instability was one of the conditions leading to the Children's removal, and as the trial court acknowledged, it has not been resolved. DHS contends that the trial court nonetheless considered whether Mother would comply with her objectives if given more time. *Id.* at 39.

DHS further claims two of the trial court's factual findings lack support in the record. First, DHS takes issue with the court's finding that Mother participated in at least some mental health services throughout the life of the case. *Id.* at 40. DHS argues that the record reflects Mother did not attend any treatment between 2016 and 2019, attended only a single intake session in 2019, and went to three therapy sessions in 2020 before being "unsuccessfully discharged." *Id.* at 40-41. DHS asserts that although Mother testified at the termination hearing that she also attended Family Therapy Counseling between December 2020 and June 2021, the court should not have credited this testimony. According to DHS, Mother did not mention these therapy sessions at a February 2021 hearing, despite the court's decision at that

hearing to reduce her visitation rights to supervised visits, due to her failure to progress with her mental health treatment. *Id.* at 37-38.[2]

Second, DHS argues the court erred in finding Mother was receiving mental health services from Family Therapy Counseling at the time of the termination hearing and planned to continue. *Id.* at 40-41. According to DHS, Mother admitted she had stopped going to therapy by the time of the hearing due to her own "reluctance." *Id.* at 42 (citing N.T. at 114, 117, 127-28).

DHS distinguishes this case from *S.K.L.R*. There, DHS argues, the trial court had credited the mother's testimony that she was not able to complete her mental health treatment due to her full-time employment, which had been a competing reunification objective imposed by the court. *Id.* at 34 (citing *S.K.L.R.*, 256 A.3d at 1111-16). Here, DHS contends, there was no such conflict preventing Mother from pursuing treatment. Rather, DHS argues, Mother testified that she did not want to attend therapy. *Id.* at 36. DHS asserts that Mother was even given an extra chance to comply with this requirement in August 2020 when DHS withdrew its first set of petitions. *Id.* at 36, 39-40.

DHS further argues that the trial court erred in considering that the Children's preference for Grandmother was due in part to the COVID-19

---

[2] To support the assertion that the court reduced Mother's visitation in February 2021 based on her failure to attend therapy, DHS cites the February 3, 2021, Permanency Review Order stating Mother's visits would be biweekly and supervised, and Cody's testimony stating that she learned after the August 2020 hearing that Mother had missed four sessions at Dr. Mary Berge and Associates. *Id.*

pandemic or Grandmother's interference, as this lost site of the Children's best interests. *Id.* at 46. Moreover, DHS argues, it is factually inaccurate, as Grandmother has not interfered with any visits since January 2020, and it was Mother's own decision to stop therapy which resulted in a decrease in her visitation rights. *Id.* at 46-47. DHS stresses that both Cody and Kinkle testified that termination of Mother's parental rights would be in Children's best interest. *Id.* at 46.

*Analysis*

A petitioner bears the burden of proving by clear and convincing evidence that termination of parental rights is warranted under Section 2511 of the Adoption Act. *Int. of L.W.*, 267 A.3d 517, 522 (Pa.Super. 2021). Section 2511 requires a bifurcated analysis, in which the court must first determine whether the parent's conduct meets grounds for termination under subsection (a), and, if so, whether termination is in the best interests of the child as provided in subsection (b). *See id.* at 522-23; 23 Pa.C.S.A. § 2511(a), (b).

DHS asserts termination was warranted under subsections (a)(5) and (a)(8). Both subsections require that the parent has failed to remedy the conditions which led to the removal of the child.[3] While subsection (a)(5) is

---

[3] Subsection (a)(5) provides grounds for termination when

> [t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period

*(Footnote Continued Next Page)*

applicable when the child has been removed for at least six months and the parent cannot or will not remedy the conditions "within a reasonable period of time," subsection (a)(8)—applicable when the child has been removed for at least a year—does not contemplate a parent's ability or desire to remedy the conditions in the future. Both subsections additionally require the court to consider whether termination would best serve the needs and welfare of the child. *See* 23 Pa.C.S.A. §§ 2511(a)(5), (a)(8).

We addressed these same subsections in *S.K.L.R.* In that case, the children had been removed from their mother's care for 25 months, and the local children's bureau filed petitions to terminate the mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(5) and (a)(8). *S.K.L.R.*, 256 A.3d at 1113, 1115. In denying the petitions, the trial court noted the progress the mother

---

of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(5). Termination is warranted under subsection (a)(8) when

[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

*Id.* at § 2511(a)(8).

- 16 -

had made in resolving many of the conditions that had led to her children's removal, including participating in some mental health treatment. *Id.* at 1117-18. It also found significant that the mother had been successful in parenting her one and one half-year-old child. *Id.* at 1118. It concluded that "but for the fact that [the mother] has not attended therapy sessions recently with a mental health professional because her work schedule allows her little time, none of the conditions that led to the removal and placement of the children continue to exist." *Id.* It held that "with a few more months of steady progress, [the mother] may avoid losing parental rights to her Children permanently." *Id.*

This Court reversed the trial court, based in large part on testimony that mother had not adequately addressed her mental health issues. *Id.* at 1119. We also concluded that the trial court had erred in considering the mother's potential to address her mental health in the future, finding it irrelevant under a subsection (a)(8) analysis. *Id.* at 1119-20.

The mother obtained review in the Supreme Court, which vacated our judgment and reinstated the trial court's order. The Supreme Court pointed out that the mother had complied with "a laundry list of goals" and found this Court mistaken in focusing "almost exclusively on [the mother's] inability to rid herself of mental health problems in concluding that the conditions that led to the [c]hildren's removal continue to exist." *Id.* at 1127-28; *see also id.* at 1129. The Court stated that when it applied the standard of review, it concluded that the record supported "the trial court's finding that the

conditions that led to the removal of the Children no longer exist." *Id.* at 1128.

The Court additionally noted the record supported the trial court's conclusion

that the mother had participated in some mental health treatment, and that

the inability to complete the goal was due in part to her work schedule. *Id.*

The Court also reiterated the standard of review in dependency cases,

which it held applies with equal force to termination proceedings. *Id.* at 1122-

23.

> This case epitomizes why appellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*Id.* at 1122 (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)). In short,

the Supreme Court found that this court had "erred by substituting its

judgment for that of the trial court." *Id.* at 1129.

DHS argues that here, unlike in *S.K.L.R.*, the trial court found no

external obstacle to Mother's ability to meet her mental health goals, such as

Mother's work schedule. However, we do not find this difference undermines

the trial court's conclusion that the conditions which led to the Children's

removal no longer exist. As in *S.K.L.R.*, Mother had a list of goals to

accomplish, and the trial court found she had resolved all but one. As in **S.K.L.R.**, the court observed that Mother had successfully been parenting another child for close to two years while simultaneously making efforts to reunite with the Children. As in **S.K.L.R.**, the trial court found Mother had made some efforts towards resolving her mental health goals. While DHS disagrees with the trial court's conclusion that Mother is currently pursuing mental health treatment, the testimony supports the trial court's finding on this issue. Mother testified that her last therapy session prior to the August hearing had been in June, and that her therapist had not sought a follow-up. Mother also responded in the affirmative when asked whether she was in treatment. **See** N.T. at 114-16, 128.

In summary, it is not within this Court's purview to decide in the first instance whether termination of Mother's parental rights is warranted. Rather, our job is to ensure there is adequate record support for the trial court's findings of fact and that it did not commit an error of law or abuse of discretion in ruling on a termination petition. As there is sufficient support in the record to support the trial court's conclusion that the conditions which led to the Children's removal no longer exist, we affirm the portions of the orders denying the petitions to involuntarily terminate Mother's parental rights.

### B. Father

*The Trial Court Opinion*

In denying the petition to involuntarily terminate Father's parental rights, the trial court acknowledged that "Father was found to be minimally

compliant with his permanency plan." Trial Ct. Op. at 3. However, the court also found that Father "was recently interested in engaging more meaningfully with his permanency plan objectives and had perhaps not received the necessary support from the CUA Case Manager who testified that she has not attempted any outreach to Father since before the prior court date." *Id.* The court "recognize[d] that the COVID-19 Pandemic has presented incredible challenges to many of the families already struggling to reunify," and that, "[g]iven Father's stated desire to engage more meaningfully," the court "believes that with additional time and services, Father may be able to get back on track with his permanency plan objectives and avoid losing his parental rights altogether." *Id.* at 17.

Regarding Father's visitation and bond with the Children, the court found that "prior to the onset of the pandemic, Father had been consistently visiting with the [C]hildren throughout the life of the case and [that] Children were bonded with both parents." *Id.* at 16-17. To support this finding, the court cited a portion of the Petition that alleged that as of June 3, 2019, "[o]bservations during the parents' visits with the [C]hildren indicated that while [Mother and Father] were both bonded with the children, they tended to disagree with each other's parenting styles during visits, resulting in one of them sitting in silence for [a while] before re-engaging with the [C]hildren." Pet. at Ex. A, ¶ qqq.

*DHS's Argument*

DHS argues the court should have terminated Father's parental rights under Section 2511(a)(1) and (2). DHS's Br. at 49. According to DHS, Father both failed and refused to perform parental duties for four years. DHS claims Father did not comply with any of his objectives, which included addressing his drug use, mental health, and parenting abilities; maintaining appropriate housing; and visiting with the Children. *Id.* at 49, 49 n.18. DHS contends the trial court continually found Father to be minimally compliant with the permanency plan throughout the life of the case. *Id.* at 49. DHS points out that in contradiction to the trial court's finding that Father has recently expressed interest in complying with his objectives, Father did not appear or testify at the termination hearing. Rather, the testimony reflected that Father had only once expressed a desire in completing with his parenting and visiting objectives, in 2020, but Father never followed through. *Id.* at 50.

DHS takes further issue with the court's findings that Father maintained visits with the Children prior to the onset of the pandemic and that Children had a bond with Father. It claims these findings are unsupported by the record. *Id.* at 50. Finally, DHS asserts it would be in the Children's best interest to terminate Father's parental rights, as Father has not maintained a relationship with the Children and Cody testified that the Children would not suffer irreparable harm from severing parental ties. *Id.* at 51-52.

*Analysis*

Subsection 2511(a)(1) provides grounds for termination when, for at least six months prior to the filing of the petition, the parent "has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). Fulfilling "parental duties" requires more than a passive interest in the child; it is an affirmative obligation to provide for the child's physical and emotional needs, including "love, protection, guidance, and support." ***In re Z.P.***, 994 A.2d 1108, 1119 (Pa.Super. 2010) (quoting ***In re B., N.M.***, 856 A.2d 847, 855 (Pa.Super. 2004)). If the evidence shows a failure to perform parental duties, the court must examine (1) the parent's explanation; (2) the post-abandonment contacts between parent and child; and (3) the effect of termination of parental rights on the child. ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa.Super. 2008) (citing ***In re Adoption of Charles E.D.M***., 708 A.2d 88, 91 (Pa. 1998)).

Under Subsection 2511(a)(2), termination is warranted when the evidence proves "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Z.P.***, 994 A.2d at 1117; ***see also*** 23 Pa.C.S.A. § 2511(a)(2). A parent's efforts to perform parental duties may not be sufficient to avoid termination under subsection (a)(2), as the emphasis of this section is on the

child's present and future need for essential parental care. *In re Z.P.*, 994 A.2d at 1117.

We affirm the trial court's decision. As to subsection (a)(1), DHS presented evidence that Father has failed to perform parental duties for a period of at least six months. *See* 23 Pa.C.S.A. § 2511(a)(1). The trial court did not find otherwise. However, the court properly considered the reasons for Father's failures to achieve his objectives—such as the onset of the COVID-19 pandemic[4]—and Father's pre-pandemic visitation with the Children. *See In re Z.S.W.*, 946 A.2d at 730. Although Cody testified that Father had never visited the Children, this contradicts DHS's allegations in the petition, as the trial court noted. The court's decision to find DHS had failed to present clear and convincing evidence that termination was warranted under subsection (a)(1) was not an abuse of discretion.

Nor did the court abuse its discretion in finding that termination was not warranted under subsection (a)(2). The court was not convinced that Father "cannot or will not" remedy the conditions leading to placement, given Father's stated desire to engage with the Children and Cody's testimony that she had not contacted Father in the months preceding the hearing. 42 Pa.C.S.A. §

---

[4] The finding that Father's failure to achieve his objectives was due to Cody's failure to contact Father lacks support in the record. The testimony did not establish when or how often Cody had contacted Father throughout the case. The only testimony on this issue was Cody's testimony that she had not contacted Father for a few months before the hearing. However, this period post-dates the filing of the petition and therefore is not relevant to a subsection (a)(1) analysis. *See* 23 Pa.C.S.A. § 2511(b).

2511(a)(2). The trial court is well-positioned to make such a judgment. As we affirm the court's conclusion that termination was not warranted under either subsection (a)(1) or (a)(2), we need not consider DHS's argument that termination would be in the Children's best interest.

## II. Placement Goal

Finally, DHS argues the court erred or abused its discretion in denying its petitions to change the permanent placement goal for the Children to adoption. As in termination cases, we employ an abuse-of-discretion standard when reviewing goal change orders. ***S.K.L.R.***, 256 A.3d at 1123. We need not accept the trial court's conclusions of law but will accept the trial court's findings of fact and credibility determinations if the record supports them. ***Id.***

*Trial Court Opinion*

The court explained it denied the petition for goal change because Mother "has made great progress in bettering herself and alleviating the conditions which led to the Children's removal." Trial Ct. Op. at 10. Similar to its findings supporting its denial of termination, the court found that Mother had alleviated almost all of the conditions which led to the Children's placement and that she has been able to house, feed, and clothe herself and her youngest child for the past two years without any assistance from DHS. ***Id.*** at 9. The court found that "although testimony was presented that Mother was discharged from Mary Berge & Associates in December 2020 for missed sessions, [the court found] credible Mother's testimony that she is currently engaged in individual therapy with Family Therapy Counseling and plans to

continue." ***Id.*** Based on these findings, the court concluded that reunification is best suited to the safety, protection, and physical, mental, and moral welfare of the children. ***Id.*** at 10.

*DHS's Argument*

DHS argues that the court should have granted the goal change because the "Children [have] languished in care for four years, [and] both parents failed to take advantage of offered services to achieve, or progress towards, reunification." DHS's Br. at 54. DHS contends that at every substantive permanency hearing, the trial court found DHS had made reasonable efforts towards reunification. ***Id.*** DHS points out that Cody and Kinkle both testified that the reasons for dependency persisted and that it would be in the children's best interest to be adopted by Grandmother. ***Id.*** at 55. According to DHS, Mother has not adequately addressed her mental health needs and voluntarily stopped attending therapy, and Father displays a "complete refusal to do anything." ***Id.*** at 55-56.

*Analysis*

A goal change request requires the court to consider the factors listed in 42 Pa.C.S.A. § 6351(f), including:

> (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

***Int. of D.R.-W.***, 227 A.3d 905, 917-18 (Pa.Super. 2019) (quoting ***In re A.B.***, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citing 42 Pa.C.S.A. § 6351(f))). In weighing these factors, the court should be guided by the best interests of the child. ***Id.*** at 918.

The court did not abuse its discretion in denying the request to change the Children's placement goal to adoption. It considered Mother's substantial progress towards her goals, her current pursuit of mental health therapy, and her success at parenting another child for the past two years and concluded that she might soon achieve reunification with the Children. This does not demonstrate that the trial court acted with "manifest unreasonableness, partiality, prejudice, bias, or ill will." ***S.K.L.R.***, 256 A.3d at 1127.

Orders affirmed.

Judge Nichols joins the memorandum.

Judge Lazarus files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2022

- 26 -